**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 26 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DYCO PETROLEUM
CORPORATION,

    Plaintiff - Appellant,

v.

MESA OPERATING CO.,

    Defendant-Third-Party
    Plaintiff - Appellee,

and

HILLIN SIMON OIL CO.,

    Defendant - Appellee,

v.

SAMSON RESOURCES COMPANY

    Third-Party Defendant -
    Appellant.

Nos. 98-6328
98-6329, 98-6399 & 98-6400
(D.C. No. CV-96-1012-C)
(W. D. Oklahoma)

**ORDER AND JUDGMENT**   *

Before **TACHA** , Chief Judge, **HOLLOWAY** and **SEYMOUR** , Circuit Judges.

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

## I

Plaintiff/appellant Dyco Petroleum Corporation (Dyco) brought the original action against defendant/appellee Mesa Operating Company (Mesa) and defendant/appellee Hillin-Simon Oil Company (HSOC). Jurisdiction in the district court was based on diversity of citizenship and the requisite amount in controversy under 28 U.S.C. § 1332. In that action, Dyco sought declaratory relief, alleging that one (or both) of the defendants was liable for gas balancing obligations arising from Mesa's overproduction from the Jarvis No.1-10 Well (the Jarvis well) located in Beckham County, Oklahoma. Mesa filed a third-party claim for indemnity against appellant Samson Resources Company (Samson). Mesa and HSOC filed cross-claims against each other.

On motions for summary judgment, the district court held in favor of Mesa on Dyco's claim and on HSOC's cross-claim. HSOC filed a motion to reconsider or amend the first decision. In that motion, HSOC contended that it should have judgment in its favor on Dyco's claim based on the rationale underlying the decision in favor of Mesa, which was that Dyco had been paid for the gas imbalance out of which its claim arose. The district court granted that motion of HSOC.

These decisions disposed of almost all of the issues in the case; there remained only a claim by Dyco against HSOC for unpaid billings in an amount of

approximately $10,000, which Dyco dismissed without prejudice. Dyco and Samson then appealed from the district court's order in favor of Mesa on the primary gas imbalance claims of Dyco in the case (No. 98-6328), and HSOC also appealed (No. 98-6329). We determined that Dyco's dismissal without prejudice of the final, unadjudicated claim was probably insufficient to achieve a final, appealable order, *see Heimann v. Snead*, 133 F.3d 767 (10th Cir. 1998), and tolled briefing in the case while allowing the parties thirty days in which to obtain either entry of judgment in the district court under Fed. R. Civ. P. 54(b) or a final, dispositive adjudication. The district court then entered judgment pursuant to Rule 54(b), thereby rendering the prematurely filed notices of appeal effective. *See Lewis v. B.F. Goodrich Co.*, 850 F.2d 641 (10th Cir. 1988) (en banc). Nevertheless, out of an apparent abundance of caution, new notices of appeal were filed following the district court's entry of judgment (Nos. 98-6399 & 98-6400). We consolidated all four appeals and exercising jurisdiction under 28 U.S.C. § 1291 now dispose of them all in this order and judgment.

## II

Most of the relevant facts are undisputed. Dyco was the operator of the Jarvis well, which began producing in 1984. Dyco and the other parties having interests in the Jarvis well had entered into a joint operating agreement (JOA) of a type which is common in the industry. (Indeed, the JOA for the Jarvis well is based on a

standardized form.)  The instant lawsuit arises from provisions for gas balancing and cash balancing which are often included in such agreements.  It is undisputed that Mesa had "overproduced" its working interest in the Jarvis well,  *i.e.*, that it had sold more than its proportionate share of gas produced from the well. [1]  Accordingly, Dyco (and any other "underproduced" working interest owner) had a right under the JOA to gas balancing from Mesa's share of future production, and in the event that production proved insufficient to make Dyco whole through gas balancing before depletion of the well, to "cash balancing" to recover the amount by which Dyco's receipts fell short of its proportionate share.  Cash balancing in this context means a payment of cash sufficient to increase Dyco's receipts and correspondingly decrease Mesa's receipts to the point that the receipts of each from the total produced and sold were proportionate to the interest each owned in the well.

The relationships among the parties in the instant case became more complicated, however, as a result of subsequent transactions.  The first such event was Mesa's sale of its interest in the Jarvis well to HSOC in February 1988 (the HSOC assignment).  It is alleged that Mesa did not inform HSOC of Mesa's liability for overproduction from the Jarvis well at that time.  In 1991, Mesa sold its interests in a number of producing wells to Samson; that transaction was effected by a

---

[1]Mesa states in its brief that it was actually its predecessor in interest which had overproduced from the Jarvis well, but Mesa also concedes that this is not material to the present dispute.

contract titled Purchase and Sale Agreement (PSA). Apparently because the sheer number of interests being transferred under the PSA made the transaction quite complex, the PSA included a provision for a "post-closing period," during which adjustments would be made to the purchase price as the parties determined the volume and value of the overproduction from the wells included in the transaction. Order On Pending Motions at 6, ¶ 10, IV Aplt. App. 953, 958. It appears that at the time it entered into the PSA, Mesa failed to realize that it had previously sold its Jarvis well interest to HSOC, and Dyco was unaware of the HSOC assignment. In any event, in the PSA the parties assigned a value of minus $170,002 to Mesa's interest in the Jarvis well, reflecting Mesa's liability for balancing to compensate for its overproduction. III Aplt. App. 584.

In June 1991, after an affiliate of Samson had acquired the stock of Dyco, Samson became the operator of the Jarvis well. In July 1991, HSOC notified Samson of its 1988 acquisition of Mesa's interest in the Jarvis well. Both of these events occurred during the post-closing period for the PSA. On September 30, 1991, during the post-closing period, and in accordance with a term of the PSA, Samson prepared and signed a document certifying the accuracy of an amended schedule of assets covered by the PSA and any associated gas balancing claims or liabilities. That schedule also listed the Jarvis well, with its net imbalance. III Aplt. App. 644, 651;

IV Aplt. App. 959. This certificate was given by Samson after it had knowledge of the HSOC assignment.

In February 1993, Mesa entered into a settlement agreement (the Settlement Agreement) with Samson, Dyco, and another Samson affiliate, to resolve a number of disputes, including disputes over gas balancing adjustments to the purchase price under the PSA. The Settlement Agreement included the following specific provision as to gas balancing obligations: "Any and all payments relating to gas imbalances as between [Mesa] and Samson as required by the terms of the [PSA] are hereby deemed to be fully paid and completely satisfied and settled . . . ." III Aplt. App. 660. The Settlement Agreement also provided that the written document represents the whole understanding of Sellers (Mesa *et al.* ) and Samson as to only matters recited therein and that the Agreement shall not affect any obligation of Sellers and Samson except as set forth in the Agreement.

After Dyco had commenced this litigation it transferred all its interests in the Jarvis well and any gas balancing claims arising therefrom to Samson. The parties stipulated that Samson had "stepped into Dyco's shoes" with respect to the claims involved herein, even though Dyco has remained a party. *See* Fed. R. Civ. P. 25(c). Accordingly, we will sometimes hereafter refer to the two companies as Samson.

## III

Mesa moved for summary judgment in the district court, arguing that Samson had assumed liability for the gas imbalance from the Jarvis well in the PSA in consideration for receiving credit in the amount of $170,000 attributable to the overproduction by Mesa. Mesa also argued that both Samson and Dyco had released Mesa from any liability for the gas imbalance in the Settlement Agreement. Mesa makes the same arguments on appeal.

The district court held that on the undisputed evidence, Samson had assumed Mesa's obligation for gas balancing in the PSA, as Mesa had asserted. Order on Pending Motions at 11, IV Aplt. App. 963. The district court also agreed with Mesa's argument that the Settlement Agreement unambiguously released Mesa from any liability for the gas imbalances related to the PSA. *Id*. at 12. The court rejected Samson's argument that the $170,000 referred to in the PSA had been "backed out" of the transaction at the time of the Settlement Agreement, noting that Samson had not produced any documentary evidence to support the assertion. Although the district court did not expressly invoke the parol evidence rule, it seems clear that the rejection of Samson's argument was based on that rule.

Samson's primary claim – and the only one we are concerned with on appeal – sought a declaration that either Mesa or HSOC, or perhaps both, were liable for the gas imbalance under the terms of the JOA. Mesa filed a cross-claim against HSOC,

alleging that any liability for the gas imbalance had been assumed by HSOC under the terms of the HSOC assignment. HSOC then filed a cross-claim against Mesa, seeking indemnity for any obligation to Samson which might be imposed on it. In its cross-claim, HSOC alleged that Mesa should indemnify it because the overproduction had occurred prior to the assignment from Mesa to HSOC; HSOC also alleged that Mesa should be liable on the basis of fraudulent misrepresentation for the alleged failure to disclose the overproduced status of Mesa's interest at the time HSOC acquired that interest.

In the same order in which it had held that Mesa was entitled to summary judgment on the primary claim by Samson, the district court also held in favor of Mesa on HSOC's cross-claims. First, it held that the fraudulent misrepresentation claim was barred by the statute of limitations of two years in Oklahoma on actions for fraud, 12 Okla. Stat. § 95.   *Id*. at 13-15. HSOC has not appealed that portion of the district court's order. The district court determined that HSOC's remaining cross-claim and Mesa's cross-claim based on the HSOC assignment were "mutually exclusive," which we take to mean that the claims were directly contradictory. The district court granted Mesa's motion for summary judgment against HSOC on these competing claims. The court determined that HSOC had assumed the obligation for gas balancing under the JOA when it purchased Mesa's interest in the Jarvis well because the obligation was a covenant which runs with the land.   *Id*. at 16.

HSOC moved for reconsideration or amendment of the court's order with respect to its gas balancing obligation. The district court granted that motion, holding that Samson's receipt of the $170,000 credit from Mesa for Mesa's overproduction from the Jarvis well as a matter of law extinguished HSOC's obligation to Samson as well as that of Mesa, which had given the $170,000 credit. Order of June 16, 1998 at 2, IV Aplt. App. 992.

## IV

### A

We review the district court's decisions on motions for summary judgment *de novo*, applying the same standard as the district court. *See Trujillo v. University of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1213 (10th Cir. 1998). Summary judgment is appropriate only if the admissible evidence shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995) (noting that only admissible evidence is considered when reviewing an order granting summary judgment).

A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented. *Id.* The burden of showing

that no genuine issue of material fact exists is borne by the moving party.       *See Adler v. Wal-Mart Stores, Inc.*  , 144 F.3d 664, 670 (10th Cir. 1998).  When, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy this burden by identifying "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."          *Id*. at 671.  This court draws all reasonable inferences in favor of the nonmoving party.       *See Curtis* , 147 F.3d at 1214. If no genuine issue of material fact is in dispute, this court then determines whether the substantive law was correctly applied by the district court.        *See Kaul v. Stephan*  , 83 F.3d 1208, 1212 (10th Cir. 1996).

Finally, we note that we apply Oklahoma law in this diversity case.  The parties seem in agreement that Oklahoma law should govern, and, although we are not informed where the contracts between the parties were executed, in light of the fact that the primary dispute arises from joint ownership of a gas well in Oklahoma, application of the law of the forum state certainly seems proper.

**B**

Samson argues that it did not assume any liability for Mesa's overproduction under the terms of the PSA.  This is so, Samson asserts, because under that contract it assumed only liabilities "directly related" to assets it was acquiring; because Mesa had already sold to HSOC the working interest in the Jarvis well to which the balancing liability is related, that interest was not an "asset" within the terms of the

-10-

PSA. Conceding that the PSA's express inclusion of the negative amount of $170,002 reflects the parties' understanding at the time they entered into the PSA that Mesa's working interest in the Jarvis well was included, Samson contends that the result is merely that by virtue of this credit Samson may have paid too little for the other assets it did acquire. Samson goes on to argue that resolving such matters as overpayment or underpayment was the purpose for which the parties agreed to the post-closing period. As we have noted, the parties eventually entered into the Settlement Agreement to resolve their disputes over the proper credits and debits identified during the post-closing period.

Samson's argument is based on a reading of the PSA which seems artificial and strained. The price paid by Samson under the PSA was reduced by $170,002, representing Mesa's liability for overproduction from the Jarvis well. This surely is evidence that the parties intended for Samson to assume this liability. In interpreting the language of a contract we construe the contract as a whole. *Mortgage Clearing Corp. v. Baugham Lumber Co.*, 435 P.2d 135, 138 (Okla. 1967). This direct evidence of the parties' intent is, we conclude, much more persuasive than Samson's argument based on a fastidious construction of the term "assets" in the contract. It is fundamental, of course, that discerning and giving effect to the intention of the parties is our prime objective. 15 Okla. Stat. § 152 (1991). As the interpretation of a written contract is a question of law for the court, *Devine v. Ladd Petroleum Corp.*,

743 F.2d 745, 749 (10th Cir. 1984) (applying   Oklahoma law), rather than one of fact, we find no error in the district court's conclusion on this point.

The district court also held that the Settlement Agreement did not alter the effect of the PSA in this regard; that is, nothing in the Settlement Agreement purports to reverse the PSA's allocation of the balancing obligation to Samson. The Settlement Agreement recited that it was made and entered into "for the purpose of resolving certain disputes between the parties and finally determining gas balancing adjustments to the Purchase Price pursuant to [the PSA] . . . ." III Aplt. App. 659. The Settlement Agreement also included the following language regarding gas imbalances:   "8.  Any and all payments relating to gas imbalances as between [Mesa] and Samson as required by the terms of the [PSA] are hereby deemed to be fully paid and completely satisfied and settled . . . ."        *Id.* at 660.  Moreover, "Samson" as used in this contract also included Dyco.       *Id.* at 659. [2]  The Settlement Agreement further provided:

> This Settlement Agreement represents the whole of the understanding and agreement of Sellers [Mesa    *et al.* ] and Samson with respect to only the matters and things herein recited and this Settlement Agreement shall have no affect [sic] upon any obligations, duties or responsibilities of Sellers and Samson arising pursuant to the terms of the Agreement except as specifically set forth herein.

*Id*.

---

[2]As noted *supra*, after the PSA was executed but before the parties entered into the Settlement Agreement, an affiliate of Samson had acquired Dyco.

Samson produced testimonial evidence in response to Mesa's motion for summary judgment that the $170,002 it had received as credit under the PSA was "backed out" of the Settlement Agreement. Samson's argument seems to be that this was done because the parties by then knew that Mesa had included the Jarvis well in the PSA by mistake. The result, if Samson's argument were accepted, would be that Mesa remained liable to Dyco for the $170,002 in spite of Mesa's having concluded the Settlement Agreement with Dyco and Samson which purported to settle all claims regarding gas imbalances. Dyco's claim for Mesa's overproduction from the Jarvis well was not encompassed in this language, the argument goes, because it was not a payment "required by the terms" of the PSA.

Analysis of Samson's argument on this issue thus is related to the first issue in that both depend, ultimately, on excluding the Jarvis well from the PSA based on Mesa's prior sale to HSOC and contrary to the express intent of the parties at the time the PSA was executed. We find the argument unpersuasive, because the plain language of the instruments simply points the other way.

We also conclude that the district court was correct to disregard Samson's testimonial evidence regarding the alleged removal of the Jarvis well imbalance from the Settlement Agreement. Samson argues that this was not parol evidence because it was evidence of the parties' actual performance of the terms of the PSA, rather than evidence of an oral agreement modifying the PSA. This misses the point,

however. The district court rejected the evidence that the Jarvis well imbalance had been "backed out" of the Settlement Agreement because Samson "offer[ed] no written evidence of such modification of the contract, as required by the PSA." Order on Pending Motions at 11, IV Aplt. App. 964. We agree with this ruling by the judge.

Samson argues that the Settlement Agreement is silent as to specifics of what particular imbalances were being settled, containing instead only global language and an aggregate price. That is plainly correct. But we disagree with Samson's conclusion that the oral testimony that the Jarvis well was "backed out" does not therefore modify the written agreement. The Settlement Agreement clearly states that *all* disputes arising from imbalances related to properties conveyed in the PSA are settled. Evidence that an imbalance from one of those properties was "backed out" certainly would alter that all-encompassing term of the written agreement. This clearly would violate the parol evidence rule which, as codified in Oklahoma, provides: "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter, which preceded or accompanied the execution of the instrument." 15 Okla. Stat. § 137 (1991).

Thus, again Samson's argument ultimately could succeed only if the Jarvis well were not included in the PSA, because if the Jarvis well were included, then it

-14-

came within the global language of the Settlement Agreement's declaration that all disputes arising from properties covered by the PSA were resolved. We have already explained that the PSA does include the Jarvis well and accordingly we are not persuaded by Samson's contentions.

In sum, we affirm the ruling below granting summary judgment for Mesa and against Samson and Dyco.

## V

Samson also appeals from the district court's entry of judgment in favor of HSOC. HSOC contends that we need not reach any other issues in this appeal after having affirmed the judgment for Mesa. HSOC's argument is that because the district court found that Samson had already been paid for the gas balancing liability which Mesa owed Dyco, and because a party is only entitled to one recovery, Samson cannot have any right to cash balancing from HSOC when the Jarvis well is eventually depleted. Samson contends that HSOC is attempting to apply a tort law concept out of its proper sphere.

We conclude that the district court's judgment in favor of HSOC on Samson's claim was correct for two reasons. First, we agree with HSOC that Samson is not entitled to pursue payment from HSOC because it has suffered no loss. *See generally Restatement (Second) of Contracts* § 293 (1979). As explained *supra*, we are persuaded that the district court was correct in holding that Samson received

-15-

$170,000 credit in the PSA for its assumption of Mesa's balancing liability; since Samson has stepped into the shoes of Dyco, the debt has been satisfied by this credit.

Moreover, the general and unqualified release given by Samson and Dyco to Mesa in the Settlement Agreement also operated as a matter of law to discharge HSOC. *See Wade v. Tapp*, 285 P.2d 377 (Okla. 1955); *see generally Restatement (Second) of Contracts* § 294. As the Oklahoma Supreme Court stated in *Wade*, "the general rule is that release and satisfaction of one joint debtor releases all, in the absence of an express reservation of a right to proceed against others." 285 P.2d at 379.

In this regard, we assume without deciding that the district court was correct in holding that the balancing obligation was binding on HSOC as a covenant running with the land. When Mesa and HSOC entered into the HSOC assignment, HSOC became, arguably, obligated on the balancing liability as a covenant running with the land. This did not release Mesa of its obligation to Dyco, however. Instead, as per the general rule, Mesa was free to assign its rights but could not delegate its duties without the consent of its obligee, in this case Dyco. Consequently, the liability was joint and, under the rule of *Wade v. Tapp*, the release of Mesa by Samson also operated as a matter of law to release the joint obligor, HSOC.

In sum, the Settlement Agreement of the parties resolved the issues dispositively, and in No. 98-6328 therefore the summary judgments in favor of Mesa

-16-

and HSOC are accordingly AFFIRMED. Because this resolution eliminates HSOC's liability, its appeal in No. 98-6329 is dismissed as moot. Likewise appeals No. 98-6399 and No. 98-6400, being duplicative of the previously filed appeals, are dismissed as moot.

Entered for the Court

William J. Holloway, Jr.
Circuit Judge